BRIAN M. BOYNTON, Principal Deputy Assistant Attorney General
BURDEN H. WALKER, Acting Deputy Assistant Attorney General

AMANDA N. LISKAMM, Director
LISA K. HSIAO, Senior Deputy Director
ZACHARY A. DIETERT, Assistant Director

PAULINE STAMATELOS, Trial Attorney (NYRN 4351649)
United States Department of Justice
Civil Division, Consumer Protection Branch
450 5th Street, NW, Suite 6400-S
Washington, D.C. 20530
Telephone: (202) 353-7744
Email: pauline.a.stamatelos@usdoj.gov

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division

EKTA DHARIA (NYRN 5219860)
Assistant United States Attorney
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7276
Fax: (415) 436-6748
Email: ekta.dharia@usdoj.gov

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

LYFT, INC., a corporation,

    Defendant.

Case No. 24-cv-7443

**COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF**

Plaintiff, the United States of America, acting upon notification and referral from the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

1.    Plaintiff brings this action for Defendant's violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and prior Commission determinations concerning unfair and deceptive acts or practices in commerce.  For these violations, Plaintiff seeks relief, including a permanent injunction, civil penalties, and other relief, pursuant to Sections 5(m)(1)(B) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(m)(1)(B), 53(b).

2.    Defendant Lyft, Inc. ("Lyft") operates a mobile app ride-hailing platform that connects consumers who provide rides ("Drivers") with consumers seeking transportation ("Passengers").  Lyft recruits and approves consumers to become Drivers, sets the rates that Drivers charge for providing transportation, and collects a portion of the fares that Drivers charge for each ride.

3.     Lyft classifies its Drivers as independent contractors rather than employees.  Drivers pay the expenses associated with providing rides through Lyft's platform, such as gas, car payments, and maintenance.  To become a Driver, consumers may incur significant start-up costs.  For example, they may need to secure a qualifying vehicle, acquire rideshare insurance, and pay business license and vehicle inspection fees to local or state regulators.

4.    In early 2021, consumer demand for ride-hailing services began to rise as access to the COVID-19 vaccine became more widespread.  Lyft recognized that it had a shortage of Drivers to meet the renewed demand, a challenge Lyft referred to internally as the "Supply Crunch."

5.    Lyft addressed its Supply Crunch by, among other things, disseminating advertisements that highlighted Drivers' hourly earnings.  Lyft's ads, however, featured hourly earnings based on the top 20% of Drivers.  Thus, most Lyft Drivers were unlikely to earn the advertised pay.

6.    Lyft has also disseminated advertisements featuring "Earnings Guarantees" that misled Drivers into believing that they would receive the guaranteed amount as a bonus in addition to their ordinary earnings.  Lyft is aware that consumers perceive these ads to be misleading because it has received tens of thousands of Driver complaints about the Earnings Guarantees.

7.    On October 26, 2021, the FTC sent a letter to Lyft with a copy of the Notice of Penalty Offenses Concerning Money-Making Opportunities.  The FTC's letter noted that Lyft could be subject to civil penalties if it violated the FTC Act in connection with its advertising claims, pursuant to 15

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

1  U.S.C. § 45(m)(1)(B) and 16 C.F.R. § 1.98(e).  The accompanying Notice of Penalty Offenses stated,

2  *inter alia*, that it is an unfair or deceptive trade practice to make false, misleading, or deceptive

3  representations concerning the earnings that may be anticipated by a participant in a money-making

4  opportunity.  Lyft continued to make deceptive earnings claims in its advertisements even after

5  receiving the Notice of Penalty Offenses.

6                                          **PLAINTIFF**

7         8.    The United States brings this action upon notification and referral from the FTC, pursuant

8  to Section 16(a)(1) of the FTC Act, 15 U.S.C. § 56(a)(1).  The FTC is an independent agency of the

9  United States Government created by the FTC Act.  15 U.S.C. §§ 41–58.  The FTC enforces

10  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in

11  or affecting commerce.

12                                         **DEFENDANT**

13        9.    Lyft is a Delaware corporation with its principal place of business at 185 Berry Street,

14  Suite 400, San Francisco, CA 94107.  Lyft transacts or has transacted business in this District and

15  throughout the United States.  At all times relevant to this Complaint, Lyft has advertised and marketed

16  its mobile app ride-hailing platform throughout the United States.

17                                         **COMMERCE**

18        10.   At all times relevant to this Complaint, Defendant has maintained a substantial course of

19  trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

20                                         **JURISDICTION**

21        11.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

22  because it arises under the laws of the United States.  The Court also has subject matter jurisdiction over

23  this action pursuant to 28 U.S.C. § 1337(a) because it arises under an Act of Congress regulating

24  interstate commerce or protecting trade and commerce against restraints and monopolies, and under 28

25  U.S.C. § 1345 because the United States is the Plaintiff.  This Court also has subject matter jurisdiction

26  pursuant to 28 U.S.C. § 1355 because this action is for the recovery or enforcement of a penalty incurred

27  under an Act of Congress.

28  COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
    Case No. 24-cv-7443

**VENUE**

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

**DIVISIONAL ASSIGNMENT**

13.     Pursuant to Rule 3-2(c) of the Civil Local Rules of the Northern District of California, the San Francisco Division serves the county in which this action arises.  A substantial part of the events giving rise to the claims occurred in the City and County of San Francisco.

**DEFENDANT'S BUSINESS ACTIVITIES**

***Background on Driver Earnings***

14.     The primary components of a Driver's earnings are (1) the driver fare, (2) tips from Passengers, and (3) bonuses, Earnings Guarantees, or other incentives.  Earnings Guarantees are discussed in more detail in Paragraphs 30–46 below.  In most cases, the fare consists of a base fare or pick-up fare, plus incremental amounts based on the actual time and distance of the ride.  The applicable fares and time and distance amounts are shown to the Driver in Lyft's driver-facing app.  In some cases, Drivers may receive cancellation or no-show fees when a Passenger cancels a ride request or fails to show up for a ride.  Drivers may also receive surcharges or subsidies, such as fuel surcharges or the California state healthcare subsidy.

15.     Lyft offers ride-hailing services in hundreds of cities throughout the United States.  The company divides its service area into more than 300 geographic regions, which are generally identified by the airport code of the regional airport (*e.g.*, "SFO" for the San Francisco region).  The fare amounts that apply to the region in which the Driver picks up the Passenger will apply to the ride, even if the ride ends in a different region.

***Hourly Earnings Advertisements***

16.     From around April 2021 to June 2022, Lyft widely disseminated inflated hourly earnings claims in web search ads, on social media, on internet job boards, and on Lyft's website.  For example, Lyft ran ads on Facebook and Instagram making the following claims for Driver positions in various markets:

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

| Atlanta, GA | |
|---|---|
| "Start driving and earn up to $33/hour" | July 2021 |
| "Up to $30/hour" | October 2021 |
| "Drivers in Atlanta make up to $29.00 an hour" | December 2021 |
| "Earn up to $29/hour driving with Lyft" | February 2022 |
| **Boston, MA** | |
| "Drivers Earn Up to $42/hr in Boston" | July 2021 |
| "Up to $43/hour" | October 2021 |
| "Earn up to $37/hour driving with Lyft" | December 2021 |
| "Drivers in Boston make up to $33.00 an hour" | February 2022 |
| **Dallas, TX** | |
| "Drivers Earn Up to $31/hr in Dallas" | July 2021 |
| "Start driving and earn up to $29/hour" | October 2021 |
| "Drivers in Dallas make up to $30.00 an hour" | December 2021 |
| "Earn up to $28/hr driving with Lyft" | February 2022 |
| **Los Angeles, CA** | |
| "Start driving and earn up to $43/hour" | July 2021 |
| "Up to $41/hour" | October 2021 |
| "Drivers in Los Angeles make up to $37.00 an hour" | December 2021 |
| "Earn up to $34/hour driving with Lyft" | February 2022 |
| **Miami, FL** | |
| "Start driving and earn up to $31/hour" | July 2021 |
| "Up to $21/hour" | October 2021 |
| "Drivers in Miami make up to $23.00 an hour" | December 2021 |
| "Earn up to $27/hour driving with Lyft" | February 2022 |

| New Jersey | |
|---|---|
| "Start driving and earn up to $34/hour" | July 2021 |
| "Up to $34/hour" | October 2021 |
| "Earn up to $28/hour driving with Lyft" | December 2021 |
| "Drivers in New Jersey make up to $28.00 an hour" | February 2022 |
| San Francisco, CA | |
| "Start driving and earn up to $44/hour" | July 2021 |
| "Up to $42/hour" | October 2021 |
| "Drivers in San Francisco make up to $40.00 an hour" | December 2021 |
| "Earn up to $38/hour driving with Lyft" | February 2022 |

17.     Many of Lyft's Facebook and Instagram ads making the inflated earnings claims resembled the representative ads presented in Figures A–D below.



**Fig. A: Facebook ad (July 2021)**



**Fig. B: Facebook ad (October 2021)**

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

6





**Fig. C: Instagram ad (December 2021)**

**Fig. D: Facebook ad (February 2022)**

18.     Lyft disseminated its search ads with inflated hourly earnings claims on Google and Bing. Figure E below shows an example of a typical Lyft web search ad from September 2021.



**Fig. E: Google ad (September 2021)**

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

19.     Lyft disseminated its job board ads with inflated hourly earnings claims on websites like Craigslist.  Figure F below shows an example of a typical Lyft job board ad from February 2022.



**Fig. F: Craigslist ad (February 2022)**

20.    As noted above, Lyft also widely disseminated its inflated hourly earnings claims on its own website.  Figure G below shows an example of a typical earnings claim on Lyft's website from January 2022.



**Fig. G: Lyft website (January 2022)**

21.    Lyft also disseminated variations of the hourly earnings claim on its website, including, for example, "Most drivers in New York City earn up to $28 per hour*" in January 2022.

22.    The vast majority of Drivers were not likely to achieve the hourly earnings figures cited in Lyft's ads.  Lyft's ads regularly exaggerated hourly earnings by 20% more than what most Drivers earned, and in some cases by more than 30%.

23.    The hourly earnings figures that Lyft used in its ads were based on internal data related to Driver earnings.  Essentially, for each geographic region, Lyft calculated the hourly earnings for each

day a Driver gave a ride that began in that region.  For the calculations, Lyft used data on Driver

earnings and hours from a recent 28-day period.  Lyft included all types of earnings in its calculation,

including the Driver fare, bonuses and incentives offered by Lyft (excluding certain types of bonuses,

such as sign-up bonuses for new Drivers), earnings guarantees, and fuel surcharges, as well as tips from

Passengers.  For the hours portion of the equation, Lyft included the entire time a Driver (a) was logged

into the Lyft Driver app and was available to accept ride requests, (b) was driving to pick up a

Passenger, (c) or was giving a ride to a Passenger.

24.    After performing its hourly earnings calculations, Lyft ranked the results for each region

by percentiles from the lowest hourly earnings to the highest.

25.    In the ads described above, Lyft used the hourly earnings calculation at the 80th

percentile for a given region.  As a result, even relying on Lyft's own calculations, only the top 20% of

Drivers—that is, only one in five Drivers—earned the hourly earnings figures quoted in the ads.  For

example, in August 2021, Lyft claimed that Drivers in New Jersey could earn up to $34 per hour when

Lyft's own calculations put the median earnings at only $25 per hour.  In the same month, Lyft claimed

that Drivers in Boston could earn up to $42 per hour when median earnings were just $33 per hour.

26.    In addition, as noted above, the hourly earnings figures used in Lyft's ads factored in tips

that Passengers paid to Drivers.  Because Lyft presented the earnings claim as an hourly amount and did

not disclose that tips were factored into the figure, many Drivers were likely to believe that the tips they

earned would be additional to the hourly earnings advertised by the company.

27.    Lyft's deceptive hourly earnings claims were typically preceded with the phrase "up to."

Many consumers were unlikely to notice the phrase or understand that it meant that typical Driver

earnings would be significantly less than the figure cited in the ad, and the phrase does not make clear

that only one in five Drivers earned the hourly figure.  The hourly earnings figure was more likely to

draw their attention.  In addition, Lyft made hourly earnings claims without the "up to" qualification in

job board ads.  *See* Fig. F ("compensation: $41.00").

28.    Lyft's hourly earnings claims on its website were followed by small-print language that

noted, among other things, that "The hourly earnings communicated above are . . . not indicative of any

1   specific driver's earnings . . . ."  Consumers were unlikely to read this language, due to its small size,

2   lack of prominence, and legalistic language.  Even those who did read the small-print language were

3   unlikely to understand that typical hourly earnings would be significantly less than the hourly figure

4   cited on the website.  As with "up to," the text does not adequately convey that only one in five Drivers

5   earned the hourly figure, nor does the text adequately convey that the hourly figure already factors in

6   tips.

7       29.    Lyft's deceptive hourly earnings claims were effective in attracting Drivers.  For

8   example, an internal analysis by Lyft employees concluded that "[d]isplaying hourly earnings in paid

9   campaigns have shown 24% increase in overall leads with the highest increase via job boards and social

10  channels (~35%)."

11                     ***Earnings Guarantee Promotions***

12      30.    Since at least January 2021, Lyft has also disseminated advertisements touting

13  promotions that the company refers to as "Earnings Guarantees."

14      31.    Typically, an Earnings Guarantee requires a Driver to complete a specified number of

15  rides within a certain time frame.  If the Driver meets the requirements of the promotion and earns less

16  than the guaranteed amount in the advertisement, Lyft will pay the Driver the difference between what

17  the Driver earned and the guaranteed amount.  For example, if the Earnings Guarantee is $2,200 for 140

18  rides in the Driver's first month, and the Driver completes 140 rides in their first month but earns only

19  $2,000 in total, Lyft would pay the Driver $200 to make up the difference.

20      32.    However, if a Driver earns the same or more than the guaranteed amount in the

21  advertisement, the Driver is not eligible for additional compensation.  For example, if the Earnings

22  Guarantee is $2,200 for 140 rides in the Driver's first month, and the Driver completes 140 rides in their

23  first month but earns $2,200 or more, the Driver does not receive any additional payment.

24      33.    Lyft uses Earnings Guarantee promotions both to attract new Drivers and to incentivize

25  current Drivers to provide more rides.  Internally, Lyft has noted that "[o]ne of the advantages about

26  displaying guarantees is that the face values are much higher than the actual payout (*i.e.*, $200 bonus per

27

28  COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
    Case No. 24-cv-7443

                                         11

1   130 rides vs $2000 guarantees for 130 rides), which may seem more attractive than the bonus (*i.e.*,

2   $200) to the applicants."

3        34.    Lyft typically sets the ride requirements for Earnings Guarantee promotions at the 80th

4   percentile of the rides in the past 30 days in a given region.  An internal Lyft document points out that

5   "[s]etting the requirement high, such as the 80th percentile, encourages drivers to work more hours in

6   the first 30 days of the activations."  The document goes on to note that "if we use the 80th percentile of

7   the rides as the ride requirement, we can assume that ~20% of drivers may meet the ride requirement

8   and get paid for incentives."

9        35.    Lyft also regularly offers Drivers bonuses in addition to their ordinary earnings for

10  completing a certain number of rides within a certain time frame.  According to consumer complaints,

11  many drivers understood Lyft's Earnings Guarantee advertisements to offer bonus promotions and

12  believed that they would receive the amount cited in the advertisement in addition to their ordinary

13  earnings from providing the rides.

14       36.    The difference between an "Earnings Guarantee" and a "bonus" can be especially

15  confusing to consumers who do not speak English as their first language.  In recent years, Lyft has

16  publicly reported that more than a third of its Drivers speak a language other than English at home.

28  COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

1      37.     Lyft has widely disseminated Earnings Guarantee advertisements via social media,

2 email, text messages, push notifications, and Lyft's website.  For example, many of Lyft's Facebook

3 and Instagram ads making the misleading Earnings Guarantee claims for new Drivers looked like the

4 examples of ads presented in Figures H–I below.



**Fig. H: Facebook ad (July 2021–Mar. 2022)**



**Fig. I: Instagram ad (Nov. 2021–Mar. 2022)**

38.     Figure J below shows an example of an Earnings Guarantee email ad for new Drivers, and Figure K below is an example of an Earnings Guarantee email ad to current Drivers.



**Fig. J: Email ad for new Drivers**



**Fig. K: Email ad for current Drivers**

39.     Lyft has long been on notice that its Earnings Guarantee advertisements are misleading Drivers.

40.     From January 2021 to at least April 2022, Lyft received tens of thousands of complaints from Drivers stating that they were led to believe that the Earnings Guarantee promotions were a lump-sum bonus.  For example:

a.     In a March 2021 complaint, a Driver wrote:  "That is not right and it's not fair false information on [Lyft's] behalf. . . . This is complete false advertisement . . . . [Y]our promotion that was offered to me was very misleading.  It seemed like if I

completed 15 rides I would instantly receive an extra $125.  Next time the promotion needs to be worded differently so that it's not misleading."

b.      From an April 2021 complaint:  "I'm going to need Lyft to reference the guarantee thing differently and not put it as you getting this amount for a certain number of rides because it's makes it confusing between [earnings guarantees and bonuses].  If it says you get $140/24 rides that's what you should get not a whole different explanation for something different because it's misleading."

c.      From a June 2021 complaint (translated from Spanish):  "I don't understand.  I was told that if I'm a new hire and make 100 or more trips within a month's period I will get a bonus, but I haven't received anything."

d.      From a July 2021 complaint:  "[T]he offer said complete 220 rides and get 3,500[.]  [It] never said complete 220 and get the difference of what you make while driving[.]  [T]his is wrong.  [V]ery very disappointed. . . . I regret working for you. . . . I was counting on that money. . . . [M]e and everyone would think we will get the offer of 3,500 not including the earnings."

e.      From a September 2021 complaint:  "[T]he wording was exactly the same as the wording on the bonus I got over the weekend for $300.  [V]erbatim except $100 for 15 rides and $300 for 30 rides.  [T]he word guarantee was nowhere written down. . . . [I]f I saw the word guarantee for 15 rides in $100, I never would have busted my butt to try to get that because I know that I'll way surpass that."

f.      From a November 2021 complaint:  "This [is] false advertis[ing].  This [was] not explained to me as the driver and [is] not acceptable.  Maybe [Lyft does] not understand[] how difficult it is to be out in bad weather, dealing with all kinds of people and the wear and tear on the driver vehicle and the person, and then [Lyft] [r]efuses to pay the driver.  This [is] unacceptable and not fair. . . . [Lyft] is misleading their drivers. [Lyft] should pay their driver[s] as stated, it shows I completed the task.  As the driver, I expected to be paid for the service I rendered."

g.      From a November 2021 complaint:  "[T]he program was not a guaranteed difference[.]  [I]t was do 100 rides by [November] 29th and get 1400 dollars . . . ."

h.      From a December 2021 complaint:  "I worked late last night to meet it. . . . Some feedback, the[] way it's presented looks [like it's a bonus] to this new driver.  I am very disappointed I misunderstood."

i.      From a January 2022 complaint:  "I feel cheated some how this does not make sense. . . . I thought I was making extra but I'm not."

j.      From a February 2022 complaint:  "I'm very upset [right] now because it's always confusion with this [guaranteed] earnings. . . . I drive hard to complete my work and now I'm not getting paid."

k.      From an April 2022 complaint:  "The verbiage you guys are using is very misleading.  Show me where it says it's a prorated amount and we can help you get up to [$]190?  It specifically says complete 17 rides and get [$]190 . . . .  If [I] was an attorney I would have a very solid case this is very misleading . . . .  You guys need to be more specific and clear with the verbiage on your promotions[.]  I had two other people look at this and they said the same thing. . . . Please send this up to your management team and marketing team . . . ."

41.     Lyft's own employees who handled Driver complaints acknowledged that Drivers were confused about the Earnings Guarantees in their interactions with Drivers.  For example:

a.      In response to a March 2021 complaint, a Lyft employee who stated that they were a manager wrote:  "We understand that this promotion terms and conditions may be a little confusing.  We apologize for this misunderstanding."

b.      In response to a November 2021 complaint, a Lyft employee wrote: "[D]rivers usually get confused with this Earnings Guarantee promotion.  They often confuse this with the usual Ride Challenge or Weekend Bonus wherein an[] 'additional' bonus is being given."

c.    In response to a February 2022 complaint, a Lyft employee wrote: "Most of the drivers are confused with Earnings Guaranteed but please allow me to explain this further."

42.    In a message thread from May and June 2021, employees from Lyft's "field team," which directly interacts with Drivers, provided feedback concerning the Earnings Guarantee confusion to Lyft's marketing team. A field team employee reported: "We continue to have incredible escalations with Drivers over the 'guarantee' verbiage. Drivers believe they are 'guaranteed' that money as a bonus and when it is explained what the purpose of the guarantee is, they become escalated and believe we are being misleading in our communications."

43.    In the same thread, another field team employee wrote: "I am talking to a driver right now. . . . [T]he main feedback from drivers is that the offer is not explained. . . . [The promotional email from Lyft says] "Complete 20 rides between 5 AM Friday, May 28 and 5 AM Monday, May 31 to earn at least $350 — guaranteed." Especially for an ESL driver [a driver whose primary language is not English], I can see how this can be deceiving. Since we're offering guarantees more often, the issue is becoming more prominent. He's very frustrated with Lyft . . . .  Is there a chance we can revisit this language to make it clearer for drivers?"

44.    An internal Lyft report from July 2021 noted "field team feedback that guarantees continue to be a major driver of confusion for drivers who misinterpret the offer structure."

45.    An internal Lyft document from October 2021 described a test of revised Earnings Guarantee ads that Lyft was conducting "in an effort to reduce confusion amongst drivers and new applicants." The document noted that Earnings Guarantees are "often misunderstood by our drivers and result in unintentional dissatisfaction." The test revised ads are presented in Figures L and M below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



**Fig. L: Revised email ad for new Drivers**



**Fig. M: Revised email ad for current Drivers**

28

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

46.     Based on the test described in the October 2021 document, Lyft adopted the revised Earnings Guarantee ads for future Earnings Guarantee promotions and widely disseminated the ads. However, Lyft continued to receive thousands of complaints each month from Drivers stating that the Drivers thought the Earnings Guarantees were lump-sum bonuses.  *See, e.g.*, Paragraphs 40(f)–(k).

### Lyft Continues to Make Deceptive Earnings Claims Despite FTC Warning

47.     In October 2021, the FTC sent a letter to Lyft, along with a copy of the Notice of Penalty Offenses Concerning Money-Making Opportunities ("Notice") (attached hereto as Exhibit A).  The Notice and accompanying letter identified specific acts or practices that the FTC has determined are unfair or deceptive and violate Section 5 of the FTC Act.

48.     As detailed in the Notice, in a series of litigated decisions the Commission determined, among other things, that it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the earnings that may be anticipated by a participant in a money-making opportunity (*i.e.*, a person who has been accepted or hired for, has purchased, or otherwise is engaging in the money-making opportunity).  This includes, for example, misrepresenting, explicitly or implicitly, that participants will or are likely to earn any specific amount or percentage; and misrepresenting the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income.

49.     As the letter accompanying the Notice stated, the above acts or practices were prohibited by final cease and desist orders, other than consent orders, issued in the cases (cited in the Notice) in which the Commission determined they were unfair or deceptive and unlawful under Section 5(a)(1) of the FTC Act.  The letter warned Lyft of its potential liability for civil penalties under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), if it knowingly engaged in acts or practices determined by the Commission to be unfair or deceptive and unlawful.

50.     Lyft received the Notice and accompanying letter on October 29, 2021.  Lyft continued to make deceptive earnings claims in its advertisements even after receiving the Notice.

51.     Approximately four months later, in March 2022, the FTC served Lyft with a Civil Investigative Demand seeking documents and information pertaining to, among other things, Lyft's use of earnings claims in advertisements and any substantiation it had for these earnings claims.

52.     Lyft ceased making hourly earnings claims in its advertisements only after learning of the FTC's investigation into Lyft's practices.

### Lyft's Unlawful Conduct

53.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Lyft is violating or is about to violate laws enforced by the FTC because, among other things:

a.     Lyft continues to disseminate misleading Earnings Guarantee claims;

b.     Lyft disseminated its misleading hourly earnings claims repeatedly over a period of more than a year;

c.     Lyft continued their misleading hourly earnings claims after receiving the Notice;

d.     Lyft ceased its misleading hourly earnings claims only after becoming aware of the FTC's investigation; and

e.     Lyft remains in the mobile app ride-hailing business and maintains the means, ability, and incentive to continue or resume its unlawful conduct.

### VIOLATIONS OF THE FTC ACT

54.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

55.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

### False or Unsubstantiated Hourly Earnings Claims

56.     Paragraphs 1–55 are incorporated as if set forth herein.

57.     In numerous instances in connection with the advertising, marketing, and promotion of Defendant's mobile app ride-hailing platform, including through the means described in Paragraphs 16–

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

29, Defendant has represented, directly or indirectly, expressly or by implication, that Drivers in specific cities or regions are likely to earn specific hourly amounts.

58.     Defendant's representations as described in Paragraph 57 are false, misleading, or were not substantiated at the time the representations were made.  Among other reasons, Lyft's hourly earnings claims were based on the earnings achieved by the top 20% of Drivers and factored in tips that Passengers paid to Drivers.

59.     Therefore, Defendant's representations as described in Paragraph 57 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II

### Failure to Disclose Earnings Guarantee Terms

60.     Paragraphs 1–59 are incorporated as if set forth herein.

61.     In numerous instances in connection with the advertising, marketing, and promotion of Defendant's mobile app ride-hailing platform, including through the means described in Paragraphs 30–46, Defendant has represented, directly or indirectly, expressly or by implication, that Drivers will earn a specified amount of compensation for performing a specified number of rides within a specified time frame.

62.     In numerous instances when Defendant has made the representations described in Paragraph 61, Defendant has failed to disclose or disclose adequately to consumers that it will pay only the shortfall, if any, between the amount the Driver earns from performing the specified number of rides and the amount of compensation specified in the offer.  This fact would be material to consumers in deciding to perform ride-hailing services for Defendant.

63.     In light of the representations described in Paragraph 61, Defendant's failure to disclose or disclose adequately the material information as described in Paragraph 62 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATIONS OF PRIOR COMMISSION DETERMINATIONS CONCERNING UNFAIR OR DECEPTIVE ACTS OR PRACTICES

64.     Pursuant to Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), if the Commission has determined in a proceeding under Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), that an act or practice is unfair or deceptive and issued a final cease and desist order, other than a consent order, with respect to the act or practice, then a person, partnership, or corporation that engages in such act or practice with actual knowledge that such act or practice is unfair or deceptive and is unlawful under Section 5(a)(1) of the FTC Act shall be liable for civil penalties.

65.     In prior litigated decisions, the Commission has determined that the acts or practices described in Paragraphs 16–46 are unfair or deceptive and violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and issued final cease and desist orders, other than consent orders, with respect to those acts or practices. In particular, the Commission has found it unfair or deceptive to misrepresent, explicitly or implicitly, that participants will or are likely to earn a specific amount or percentage, and to misrepresent the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income. *See* Exhibit A, Notice ¶¶ 1.d, 1.f.

66.     Pursuant to Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), for the purpose of computing civil penalties, each and every instance that Defendant has made to a consumer a misrepresentation identified in the Notice, including each and every instance that Defendant caused to be disseminated an advertisement that included such a misrepresentation to a consumer, or caused the same to be shown to a consumer, since receiving the letter and Notice, constitutes an act or practice that the Commission has determined in a prior proceeding to be unfair or deceptive and unlawful under Section 5(a)(1) of the FTC Act.

67.     Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015), and Section 1.98(e) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(e), effective January 10, 2024, authorizes the award of monetary civil penalties of up to $51,744 for each violation of prior Commission determinations concerning unfair and deceptive acts or practices in commerce.

## Count III

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

**Violations of Prior Commission Determinations Known to Defendant**

**Regarding Defendant's False or Unsubstantiated Hourly Earnings Claims**

68.     Paragraphs 1–67 are incorporated as if set forth herein.

69.     Lyft received the Notice and accompanying letter on October 29, 2021.  Since that time, Defendant had actual knowledge that, in connection with the advertising or promotion of money-making opportunities, making false, misleading, or deceptive earnings claims—including, specifically, misrepresenting, explicitly or implicitly, that participants will or are likely to earn a specific amount—is an unfair or deceptive act or practice, unlawful under Section 5(a)(1) of the FTC Act, and subject to civil penalties.

70.     In numerous instances, as set forth in Paragraphs 16–29, Defendant represented, directly or indirectly, expressly or by implication, that Drivers in specific cities or regions were likely to earn specific hourly amounts.

71.     Defendant's representations as described in Paragraph 70 were false, misleading, or were not substantiated at the time the representations were made.  Among other reasons, Lyft's hourly earnings claims were based on the earnings achieved by the top 20% of Drivers and factored in tips that Passengers paid to Drivers.

72.     Defendant engaged in the acts and practices described in Paragraphs 70–71 with the actual knowledge, as set forth in Paragraphs 47–50, that the acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and the Commission issued final cease and desist orders, other than consent orders, with respect to those acts or practices.  Defendant, therefore, is liable for civil penalties under Section 5(m)(1)(B) of the FTC Act.  15 U.S.C. § 45(m)(1)(B).

**Count IV**

**Violations of Prior Commission Determinations Known to Defendant**

**Regarding Defendant's Failure to Disclose Earnings Guarantee Terms**

73.     Paragraphs 1–72 are incorporated as if set forth herein.

74.     As set forth in Paragraphs 47–50, at least since receiving the Notice and accompanying letter, Defendant had actual knowledge that, in connection with the advertising or promotion of money-

making opportunities, making false, misleading, or deceptive earnings claims—including, specifically, misrepresenting the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income—is an unfair or deceptive act or practice, unlawful under Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and subject to civil penalties.

75. In numerous instances, set forth in Paragraphs 30–46, Defendant represented, directly or indirectly, expressly or by implication, that Drivers will earn a specified amount of compensation for performing a specified number of rides within a specified time frame.

76. In numerous instances when Defendant made the representation described in Paragraph 75, Defendant failed to disclose or disclose adequately to consumers that it will pay only the shortfall, if any, between the amount the Driver earns from performing the specified number of rides and the amount of compensation specified in the offer. This fact would be material to consumers in deciding to perform ride-hailing services for Defendant.

77. Defendant engaged in the acts and practices described in Paragraphs 75–76 with the actual knowledge, as set forth in Paragraphs 47–50, that the acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and the Commission issued final cease and desist orders, other than consent orders, with respect to those acts or practices. Defendant, therefore, is liable for civil penalties under Section 5(m)(1)(B) of the FTC Act. 15 U.S.C. § 45(m)(1)(B).

**CONSUMER INJURY**

78. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

**CIVIL PENALTIES**

79. Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), authorizes this Court to award civil penalties for each violation of prior Commission determinations known to Defendant.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

B.    Impose civil penalties on Defendant for every instance Defendant participated in an act or practice with actual knowledge that it was unfair or deceptive; and

C.    Award any additional relief as the Court determines to be just and proper.

Dated: October 25, 2024                    Respectfully submitted,

                                           **FOR THE UNITED STATES OF AMERICA:**

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General
                                           Civil Division

                                           BURDEN H. WALKER
                                           Acting Deputy Assistant Attorney General

                                           AMANDA N. LISKAMM
                                           Director

                                           LISA K. HSIAO
                                           Senior Deputy Director, Civil Litigation

                                           ZACHARY A. DIETERT
                                           Assistant Director


                                           */s/ Pauline Stamatelos*
                                           PAULINE STAMATELOS
                                           Trial Attorney
                                           Consumer Protection Branch
                                           U.S. Department of Justice


                                           ISMAIL J. RAMSEY
                                           United States Attorney
                                           Northern District of California

                                           */s/ Ekta Dharia*
                                           EKTA DHARIA
                                           Assistant United States Attorney

                                           Attorneys for the United States of America

1

**OF COUNSEL, FOR THE FEDERAL
TRADE COMMISSION:**

2

3

KERRY O'BRIEN
Regional Director
Western Region San Francisco

4

5

EMILY COPE BURTON
Assistant Regional Director
Western Region San Francisco

6

7

EVAN ROSE (CABN 253478)
ABDIEL T. LEWIS (CABN 339339)

8

Attorneys
Federal Trade Commission

9

Western Region San Francisco

10

90 Seventh St., Suite 14-300
San Francisco, CA 94103

11

Phone: (415) 848-5100
Email: erose@ftc.gov, alewis4@ftc.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443